## STYMETS and others *vs.* BROOKS.

Where a party by a written instrument acknowledges to have received a *deed* conveying to a *third person* lands, to be paid for in a specified manner, and at the foot of the instrument promises to see the contract fulfilled, such promise is not within the *statute of frauds*, and may be enforced by action.

So, where the *deed* is executed to enable the grantee to compromise with the persons in possession, and the grantee conveys a portion of the land and receives the consideration money, the guarantor of the contract is liable for the money thus received; but where the grantee receives a surrender of a portion of the land from the tenant, who attorns to him, the guarantor is not liable for its value, the grantee or his heirs being considered in law as holding the same *in trust* for the grantors.

Had the land thus surrendered been sold under a valid judgment and execution against the grantee, and thus applied to the benefit of the grantee, *it seems* that the guarantor would have been liable for its value.

*Lands* cannot be sold on an execution *issued after the death of the defendant*, although the execution bears *teste* as of a day *previous to the death* of the defendant.

THIS was an action of *assumpsit*, tried at the Orange circuit in September, 1831, before the Hon. CHARLES H. RUGGLES, one of the circuit judges.

The instrument declared on is in these words : " This is to certify that I have this day received from Peter Stymets and others the deed of lots No. 54 and 72, containing 500 acres, situated in Chenango county, as described in the said deed, in favor of *Jonathan Brooks*, the lot No. 72 containing 260 acres ; the agreement is, that Peter Stymets and the others are to receive one dollar per acre, viz. sixty dollars when the said Brooks gets possession, the remainder in one and two years in equal payments of one hundred dollars each year. Lot No. 54, containing 240 acres, was sold by Ann Stymets, widow of Frederick Stymets, deceased, some 20 years ago, to Edmond Cook, for three dollars per acre. There has been received upon it between two and three hundred dollars ; the balance, with the interest, is still due. The understanding is, that if *Jonathan Brooks* can *compromise* with the present tenants, and they pay the balance due, according to contract, from Edmond Cook, with the interest, he is bound so to do ; and Peter Stymets hereby promises to compensate him liberal (*liberally*) for his trouble, or otherwise to act as in his judgment he may see fit. It is understood that *Jonathan Brooks* is to be at the expense himself of all surveys and other charges that may accrue.

I hereby promise and engage to see the above contract and promise fulfilled. New-York, 24th April, 1826. (Signed,) *John J. Brooks*."

The suit was brought against *John J. Brooks ;* after setting forth the execution of the deed referred to in the instrument, and the purport of the instrument itself, the plaintiffs in the first count of the declaration aver that on the 1st May, 1828, Jonathan Brooks, by virtue of the deed, entered into possession of part of lot No. 72, had the same surveyed and ascertained its contents to be only 190 instead of 260 acres, and took the sole and exclusive possession of the said 190 acres ; that on the 12th April, 1827, Jonathan Brooks, by virtue of the said deed and agreement, *compromised* with one Luther, a tenant of part of lot No. 54, who surrendered to him 19½ acres of land of the value of $117, which 19½ acres Jonathan Brooks sold and conveyed away and converted the price thereof to his own use ; and that on the 11th August, 1827, Jon-

NEW-YORK,
May, 1833.

Stymets
v.
Brooks.

athan Brooks recovered from one Landers, a tenant residing on lot No. 54, 60 acres of land, another parcel of lot No. 54, and entered into the peaceable possession thereof, and converted the same to his own use, which 60 acres were at the time, of the value of $300, of all which premises the said *John J. Brooks* had notice. By means, &c. the said John J. Brooks became liable to pay, &c. yet, &c. The declaration also contained a count in *indebitatus assumpsit* for land sold and conveyed by the plaintiffs to Jonathan Brooks at the request of the defendant, and also a count for money had and received by Jonathan Brooks at the instance of the defendant. The defendant pleaded *non assumpsit.* On the trial, the plaintiffs proved the execution of the deed referred to in the instrument, bearing date 2d April, 1826, and also of the instrument itself, and then proved that Jonathan Brooks claimed to be the owner of lot No. 72, surveyed it and ascertained its contents to be 190 acres ; that he brought an ejectment against a person claiming to be the owner, who surrendered the lot to him in June, 1828, but that a tenant of such defendant remained in possession of 3 or 4 acres ; that in May, 1826, Jonathan Brooks compromised with one Luther, a tenant of part of lot No. 54, and received the surrender of $19\frac{1}{2}$ acres of land, which, in May, 1827, for the consideration of $156, he conveyed to Luther, releasing to him 90 acres of lot No. 54 ; and that on the 11th August, 1827, Jonathan Brooks compromised with one Landers, who was in possession of the residue of lot No. 54, and who surrendered to Brooks 60 acres of the said lot, and became the tenant of the same under Brooks. The value of the $19\frac{1}{2}$ acres was shewn to be $6 per acre, and the value of the 60 acres $5 per acre. The plaintiff also proved that on an execution under a judgment in favor of J. C. Clark against Jonathan Brooks for $1200 debt, &c. docketed in August, 1827, lot No. 72 and the 60 acres in lot No. 54, surrendered by Landers, were sold, of which a deed was executed by the sheriff of Chenango to the purchaser on the 23d March, 1831. It was proved that the execution on which the sale was had, was *issued after the death* of Jonathan Brooks, but that it bore *teste* of a day anterior to his death ; and it was also proved that the services of Jonathan Brooks in refer-

NEW-YORK,
May, 1833.

Stymets
v.
Brooks.

ence to lot No. 72 were worth to the plaintiffs the sum of $75, and in reference to lot No. 54 were worth $25.

The judge charged the jury that the defendant was responsible for the 190 acres of land in lot No. 72 at the rate of one dollar per acre, with the interest thereof from June, 1828, deducting the 3 or 4 acres, of which it did not appear that Jonathan Brooks ever obtained possession; that he was also responsible for the value of the 19½ acres of land in lot 54 sold to Luther, with the interest thereof; that as to the 60 acres, although it might be doubtful whether the more appropriate remedy was not in equity, still he was of opinion that the plaintiffs were entitled to recover the value of the same, with interest from the time that Landers became the tenant of Brooks, and that the defendant was entitled to a deduction as a compensation for the services of Jonathan Brooks. The jury, in conformity to the charge of the judge, found a verdict for the plaintiffs for $633,50, including in such verdict an *item* of $386,68, as the value of the 60 acres, with the interest thereof. The defendant moves for a new trial.

*J. R. Van Duzer*, for defendant.

*T. McKissock & J. Story*, for the plaintiffs.

*By the Court*, NELSON, J. It was said on the argument, that the promise of the defendant upon which this suit is brought was bad under the statute of frauds, on the ground that it was a collateral undertaking for *Jonathan Brooks*, and there was no consideration in the note or memorandum produced and relied on. The objection was not made at the trial, which is probably a sufficient answer, but we are satisfied if it had been, it could not be sustained. The delivery of the deed to the defendant by the plaintiffs, which is stated in the written memorandum, constitutes a good consideration for his undertaking, 1 *Caines*, 45; 3 *Johns. R.* 100; it is fair to infer that, without such engagement on the part of the defendant, the plaintiffs would not have parted with their title upon the sole responsibility of *Jonathan Brooks*. Here was an inju-

ry or loss to the plaintiffs, if not benefit to the defendant, which creates a sufficient consideration.

It is conceded there is no valid objection to the recovery of the price of lot No. 72, as the agreement is absolute to pay therefor $1 per acre. On survey, the lot fell short of the estimate by the parties, and therefore a deduction was made on the trial. Nor do I perceive any objection to the recovery of the value of the nineteen and a half acres of lot No. 54, as Brooks *compromised* with one of the tenants, as he was authorized to do by the agreement, and received for the same $156. A reasonable construction of that instrument obligates *Jonathan Brooks* to pay to the plaintiffs the amount received on a compromise with the tenants, and of course the defendant is bound to see that obligation fulfilled. Any other construction would render the agreement absurd and nugatory. But the value of the sixty acres, parcel of lot No. 54, which remained in Brooks undisposed of in his lifetime, was, I think, erroneously included in the recovery.

Although the agreement is obscurely drawn, and its true meaning somewhat difficult to ascertain, yet, so far as lot No. 54 is concerned, the object seems to have been to obtain a compromise with the tenants, who were probably holding adversely to the plaintiffs, by inducing them either to purchase or give up possession. If they purchased, the consideration belonged to the plaintiffs, and Jonathan Brooks was to be compensated for his trouble ; if they refused and gave up possession, then he was to hold the same for the benefit of the plaintiffs. This is fairly to be inferred from an examination of the whole instrument, and particularly by reference to the terms agreed on as to the other lot. As to that a price was stipulated, which Jonathan Brooks was to pay if he obtained possession ; and we are bound to infer that if he was to be holden as purchaser of this lot also, a like stipulation would have been made. As to this lot, however, the only obligation imposed was to settle with the tenants, by receiving the balance due on an old contract which had been given for the lot, or he was otherwise to act as in his judgment he should see fit. He did compromise by receiving $156 for part, and possession of sixty acres of land. The money he was bound to

pay over, and the sixty acres he held as trustee for the plaintiffs. The title was probably given to him by them, to enable him to complete any arrangements he might make with the tenants. Most clearly, if it was intended to hold him personally for the value of such part as he obtained possession of, on any arrangement he might make, it should and would have been so stipulated in the agreement.

But it is said that inasmuch as the sixty acres have been sold on judgment and execution for the benefit of *Jonathan Brooks,* the defendant ought to be accountable to the plaintiffs for the value. Whether this consequence would follow from the agreement, it is not important to examine, though I am inclined to think it would. It is clear that the title still remains in the heirs of *Jonathan Brooks,* and in equity they would be considered as holding it subject to the trust or right of the plaintiffs. The judgment of Clark is a lien upon the land at law, but in equity such lien would be subject to the rights of the plaintiffs. 1 *Paige,* 125. 2 *id.* 267. The sale on the execution was inoperative, and passed no title to the purchaser. After the death of a defendant, no execution can issue against his personal representatives, heirs or terre-tenants, without a *scire facias.* 2 *Saund.* 6, *n.* 1, 72, *a. Bacon, tit. Execution,* 731, *pl.* 14, *note.* 2 *Tidd,* 1029. 2 *Archb. Pr.* 88. The reasons given are, that a new party is affected by the execution, and there would be a discrepancy between it and the record, and indeed there is no authority for the process. A *scire facias,* therefore, is necessary not only to make these new parties parties to the record, put to give them a day in court to shew cause, if any, against the application of the property to the discharge of the judgment. A practice has been reluctantly sanctioned by the courts, which at first view would seem to be an exception to the above rule ; but it is not. If a defendant dies within the year and day, (the time within which an execution may issue of course against him if living,) execution may issue *after,* provided it can be tested according to the practice of the court before his death. *Graham's Pr.* 308, 650. 1 *Archb. Pr.* 282. 2 *id.* 90. Though this practice is well settled, an examination of the English cases will shew that it was long contested, and its justice and propriety seri-

ously questioned, as in effect it gave an unjust preference to the plaintiff in the execution, over prior claims in the distri- bution of the assets. 7 *T. R.* 20. 6 *id.* 368. 1 *Bos. & Pul.* 571. The reasons of this practice are, that the execution as to the defendant relates to the *teste* and binds the goods from that time, and there is therefore no incongruity or defect in the record, as that would shew the goods bound before the death of the defendant. According to this theory, there is no new party interested or affected, and the case is viewed in the same light as if the execution had actually issued, the proper- ty taken and in possession of the law at the time of the death of the defendant. With the exception just stated, even a *fi. fa.* cannot be issued after the death of the defendant until the judgment is revived, and the reasons given for it have no ap- plication to any other species of execution, and it is expressly confined to the goods and chattels of the deceased. 2 *Saund.* 6, *n.* 1. 2 *Ld. Raym.* 849. 1 *Archb. Pr.* 282. 2 *id.* 88. All the cases to be found in the books in which the exception is stated relate to the common law writ of *fi. fa.*, which goes on- ly against the *goods and chattels* of the defendant. 2 *Tidd,* 915. 1 *Saund.* 219, *e. f.* It is the judgment which binds the land, and the execution is used only as process by which to raise the debt out of it. With us the land is sold absolutely, giving fifteen months credit on the judgment to the defend- ant to redeem. In England, the elegit directs the sheriff to deliver a moiety, of which the plaintiff holds possession till the debt is paid, and the *levari facias* appropriates the rents and profits on like terms. The teste of these writs is unimportant, except so far as the regularity of the process is concerned. On the death of the defendant, the *real estate* descends to his heirs, and to allow execution to be afterwards issued and the lands sold would be affecting the rights of new parties, without an opportunity to be heard. Serjeant *Williams*, in his note to *Jefferson et al.* v. *Morton et al.*, 2 *Saund.* 6, says, that in case of the death of a defendant within the year and day, the plain- tiff cannot sue out an elegit under the statute, 2 *West, c.* 18, against his *lands* in the hands of the heir or terre-tenants, or generally any other execution, without a *sci. fa.*, although he may in some cases have a *fi. fa. against the goods* in the hands

of the executor, referring to the exception above stated. So if the conusor dies within the year, the conusee cannot have an elegit against his heirs or terre-tenants without such writ, the rule being, he says, that where a new person, who was not a party to a judgment or recognizance, becomes chargeable to the execution, there must be a *scire facias* to make him a party to the judgment or recognizance. If the above views be correct, then the sixty acres have not been appropriated for the benefit of Jonathan Brooks, and if he held as trustee for the plaintiffs, as I am of opinion he did, a new trial must be granted, unless the plaintiff will deduct $386,68, the amount recovered for the sixty acres. The remedy in respect to the sixty acres must be in another forum. I perceive no well founded objection to the interest as charged.

New trial granted, unless plaintiffs deduct $386,68 from the verdict.